UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 12 B 15638 |
| CHRISTOPHER GIDDENS, | ) | |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| MARTA MORALES, | ) | |
| | ) | Adv. No. 12 A 947 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER GIDDENS, | ) | Judge Pamela S. Hollis |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter comes before the court following trial on the complaint brought by Plaintiff Marta Morales against her ex-husband, Defendant Christopher Giddens. Morales sought a finding that Giddens' debt to her is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), (a)(5), (a)(6) and (a)(15).

Judgment will be entered for Giddens on § 523(a)(5), because there was no evidence that the debt he owes to Morales is in the nature of alimony, maintenance or support. Judgment will also be entered for Giddens on § 523(a)(15), because Giddens converted his bankruptcy case to Chapter 13 after the adversary proceeding was filed and a Chapter 13 discharge includes debts that would otherwise be excepted under § 523(a)(15) from a Chapter 7 discharge.

For the reasons stated below, the court will enter judgment for Giddens on § 523(a)(6).

Finally, judgment will be entered for Morales pursuant to § 523(a)(2). As discussed below in greater detail, since Giddens incurred the debt to Morales without any intention of

paying it, and because he delayed and consistently attempted to thwart her efforts to collect the debt, Giddens committed fraud. Therefore, even if Giddens completes his Chapter 13 plan and receives a discharge, his debt to Morales will be excepted from that discharge. As discussed at previous hearings in this proceeding, the amount of that debt will not be liquidated by this court.

## FINDINGS OF FACT

Marta Morales and Christopher Giddens were married in 1998 and divorced in 2008. Tr. at 25-26. At the time of their divorce, they were joint owners of a single family home at 6208 West Wrightwood in Chicago. Giddens kept the home and still lives there today. Tr. at 168.

The Judgment of Dissolution of Marriage entered on June 23, 2008, memorialized the agreement that Giddens and Morales reached to divide their property. Morales was awarded certain personal property from the home (the guest bedroom sleigh bed and bedroom set, two 37-inch flat screen televisions, a sectional sofa and matching chair and ottoman), a 2007 Jeep Cherokee, a 2005 BMW, and $257,000, less a $30,000 credit. The money was due in full on or before July 1, 2008. The JDOM provided that "[e]ach of the parties shall promptly . . . perform all acts necessary to effectuate and satisfy the terms and provisions as set forth herein." Bates 000019-22.

Morales relied on the promise that she would quickly receive $227,000 when deciding whether to settle or to go to trial against Giddens. Tr. at 50; Tr. at 200. During the marriage, Morales worked for the Chicago Public Schools, and she and Giddens each started their own business, Tr. at 53-54, but she planned to go back to school and to live by herself after the divorce, Tr. at 51. At the time of the trial, however, Morales testified that she lives with her brother. She earns $13.60 per hour working as a night cook at a casino. Tr. at 25.

Morales returned to state court numerous times to compel Giddens to comply with the JDOM. Just two months after the JDOM was entered, the state court began issuing orders regarding Giddens' lack of compliance. Orders issued by the state court include:

- August 26, 2008. State court granted Morales the right to place a lien on Giddens' property "as well as file non-wage garnishments against Respondent's [Giddens'] bank account to satisfy the outstanding judgment in the amount [of] $227,000." Bates 000012.

- September 11, 2008. State court issued Order on Rule to Show Cause why Giddens should not be held in contempt of court for failure to pay $227,000 to Morales. Bates 000009.

- September 25, 2008. State court ordered Giddens' Bentley to be sold and all proceeds remaining after the lienholder has been paid "to be held in client escrow account for the benefit of Petitioner [Morales]." Bates 000007.

- October 23, 2008. State court "finds an emergency exists and orders $5,000.00 of the proceeds from the sale of the Bentley shall be turned over to Marta Morales immediately." Bates 000005.

- December 22, 2008. State court forbade Giddens from transferring or destroying any property under any circumstances, and requiring him to immediately turn over a Range Rover. Bates 000004.

- August 11, 2010. State court ordered Giddens to appear on August 18, 2010, to show cause why he should not be held in contempt for failure to pay Morales $157,000 plus interest as ordered in the JDOM. Bates 000039.

- August 18, 2010. State court found Giddens in contempt of court and ordered him to turn over personal property by August 28, 2010. He was warned that failure to comply could result in incarceration. Bates 000036-38.

- September 10, 2010. After a hearing on a rule to show cause, state court found Giddens guilty of willful contempt for failure to comply with the August 18, 2010 order. The judge ordered the Sheriff to take Giddens into custody. Bates 000033.

- October 4, 2010. State court ordered turnover to Morales' counsel of $3,000 of Giddens' $5,000 cash bond from the body attachment. The body attachment was then quashed. Bates 000031.

- December 8, 2010. After trial, state court found that Giddens owned a 2008 Land Rover, Range Rover Sport that he had fraudulently transferred to his aunt, Marchella Williams. Williams was ordered to turn over the vehicle to the court for transfer to Morales so that she could sell it and "[a]ll proceeds from the sale of said vehicle shall be tendered to MARTA, a payment toward the judgment owed by CHRISTOPHER." Bates 000023-24.

- October 28, 2011. State court held that Giddens failed to purge the contempt and that he "shall be committed to the Cook County Department of Corrections until he pays $162,427.47 to Ms. Marta Morales; a sum which represents the remainder of the amount due per the agreed judgment entered on 6-23-08." Bates 000044. An order of commitment was issued on the same date. Bates 000045.

- March 30, 2012. State court entered attachment order directing the Sheriff to take Giddens into custody immediately. "Purge amount only by Cash Bond in the amount of $162,227.47." Bates 000049.

In fact, more than two years passed before Giddens turned over to Morales the personal property described in the JDOM. Tr. at 30. Only after Giddens served time in jail did Morales get her furniture. Tr. at 152-53. In the interim, Giddens tried to pass off thrift store furniture as the property that he owed to Morales. Tr. at 30. Photographs introduced into evidence demonstrated a stark difference between the well-maintained, higher quality furniture that was in the Wrightwood home and had been awarded to Morales, and the furniture Giddens initially turned over to his ex-wife. Bates 000490-495. Although the JDOM specifically stated that Morales was awarded flat screen televisions, Bates 000020 at 2 ¶ J(5), Giddens tried to give her what are clearly cathode ray tube (CRT) televisions. Despite the description in the JDOM, Giddens testified that one of the televisions Morales had been awarded was a plasma television with "a big projection on the back wall" and not a flat screen television. Tr. at 99, lines 24-25.

When he finally turned over the furniture – and it was damaged – Giddens told Morales that she wouldn't get anything else from him. Tr. at 32. Damage to the furniture included: "The dresser was scratched, the armoire was scratched, the wood – the wood part; and he stepped on the sofa, because a shoe print was on the sofa." Tr. at 31, line 25 – p. 32, line 2. In fact, Giddens stepped on the sofa in front of Morales. Tr. at 32.

Morales ran into similar problems in obtaining the Jeep. When Giddens finally turned over the Jeep, it had been severely damaged. "The DVD [player] was missing, there was garbage inside the truck, and there was gum on the steering wheel." Tr. at 27, lines 13-15. Bates 000366 – 371. To add insult to injury, Giddens had his friend Mike Jocic drive the Jeep over to Morales at the Brickyard Mall in Chicago, and then Giddens picked Jocic up in the exact same make and model Jeep – except that his was in perfect condition. Tr. at 27-28. When he arrived, Giddens told Morales, "Bitch, you're not getting nothing else." Tr. at 28, lines 16-17.

5

During the marriage, Giddens purchased a Bentley with a $95,000 down payment. Bates 000343. The down payment came from Giddens' brother Frederick. Tr. at 43. Two checks were issued by Fifth Third Bank, in the amounts of $50,000 and $45,000, at about the same time Giddens purchased the Bentley. Tr. at 88-89. Bates 000344-351.

During Morales' collection proceedings, the state court judge required Giddens to put the Bentley up for sale through consignment. Tr. at 103. Despite the evidence that Frederick had put up the down payment, Mike Jocic filed a handwritten state court complaint seeking possession of the Bentley shortly after the sale by consignment was ordered. Bates 000352. Giddens gave Morales' attorney a letter from Jocic, notarized by Giddens' personal banker at Fifth Third Bank, that the $95,000 down payment had been a gift of appreciation in return for Giddens' services as a reverend. Bates 000353; Tr. at 41-42. Giddens is not a minister. Tr. at 42. Jocic's lawsuit was eventually dismissed for want of prosecution. Bates 000354.

Also during the marriage, in May 2006, Giddens or his personal banker Elizabeth Ramos made several withdrawals or cashed certificates of deposit totaling $348,338.85. Bates 000330-336. On May 17, 2006, Giddens' brother Frederick deposited exactly that amount in an account at Fifth Third Bank. Bates 000331. According to Christopher Giddens, the money he transferred to Frederick was payment for two stores. Tr. at 73-74. The court heard no evidence about those stores, nor did it see any documentation in support of this assertion. When asked to clarify how much money he had at Fifth Third Bank when he made the withdrawals and closed his accounts, Giddens testified: "I don't remember. I don't remember nothing about no Fifth Third Bank. I don't remember about the money, what was in there." Tr. at 157, line 24 – p. 158 line 1.

In 2009, Giddens met Agnieszka Materna, who was employed as a loan officer at a mortgage company. Tr. at 176. He was flipping properties and looking for investors, and began

6

sending potential investors to her for prequalification. Tr. at 176-77. Giddens and Materna dated for several months in 2010. Tr. at 177.

Giddens referred a prospective investor to Materna in the spring of 2010 regarding property at 6156 N. Wabansia in Chicago. Tr. at 177-78. Materna came to Giddens' home in May 2010, and watched him fill out and sign documents related to Wabansia, including a Condominium/PUD project questionnaire. Tr. at 181; Bates 000480.B001. Giddens told Materna that he owned Wabansia, Tr. at 179, but that his brother Frederick was on the title because he was "hiding the assets from his ex-wife, that's why he's using his friends and family." Tr. at 181, lines 18-19. Giddens also told Materna that he owned two additional properties in Chicago, on Christiana and on 5th Place. Tr. at 192. Materna never saw any documents showing Giddens' name on the title for those properties, "because he said he's hiding the assets from his ex-wife." Tr. at 192, lines 15-16.

Eventually Materna agreed to invest $20,000 with Giddens for property at 628 North Christiana in Chicago. Giddens wrote up their agreement in a handwritten contract dated June 7, 2011. Bates 000454. In return for Materna's investment, Giddens promised to pay her $40,000 when he sold the property for at least $200,000. If the property didn't sell within a year, Materna was entitled to rent from one of the units until her debt was paid or a sale closed. Materna went to Giddens' house to sign several documents related to her investment.

During the trial, Giddens at first denied that he wrote the contract.

> Q: You drafted a document dated June 7th of 2011 where you promised to pay Ms. Materna $40,000 once the property was sold?
>
> A: No. My brother did a document, which she stole from his office, and then she got fired and everything, so we did not go through with that. He was going to sell a building to us, and we did not go through it.

Tr. at 113, line 24 – p. 114, line 6.

Giddens then insisted that the handwritten contract at Bates 000454 was only the first page of a three page document. "[T]here's two more copies to this. She needed to bring you the other documents." Tr. at 115, lines 19-20. When asked why he didn't have all three pages, Giddens again accused Materna of stealing the document from his brother's office. Tr. at 116. Several times when he was asked about the contract – which is dated at the top and signed at the bottom and provides no hint that it is the first page of three – Giddens insisted that it was incomplete. His memory of this one particular document was clear and detailed.

Materna and Giddens discussed the fact that he owned the Christiana property even though his name was not on the title. As Giddens explained it to Materna, he was "hiding the assets from his ex-wife." According to a Special Warranty Deed, the Federal National Mortgage Association transferred the property on Christiana to Mark Giddens – another brother – on May 4, 2011. Bates 000458. Mark's mailing address on this deed is 6208 West Wrightwood – the same address as Christopher Giddens' single family home. In fact, according to his Illinois Secretary of State ID card, Mark's address is 4932 Crain Street, Unit 2 in Skokie. Bates 000461.

The Special Warranty Deed provides that while the tax bill should be mailed to "Mark Giddens," the deed once recorded should be mailed just to "Giddens," no first name. The address to which the recorded deed should be sent? 6208 West Wrightwood, the same address as the single family home that Giddens received in the divorce.

Mark sold the Christiana property in December 2013. His attorney was Phyllis Price, who had represented Christopher Giddens in other matters. Tr. at 119; Bates 000460.

Materna never recovered her $20,000 investment. She checked Giddens' bankruptcy docket and discovered that Morales had filed this adversary proceeding. When Giddens was asked why he didn't schedule Materna's debt, he testified: "Because we was dating. That was

8

money that she was helping me out with. We was talking, we was – she said, Hey, Chris, I want to help you out. I know right now you're going through hard times. And that's what she did." Tr. at 116, lines 5-9.

In 2011, Materna pulled a credit report for Giddens' aunt, Marchella Williams, when Williams was trying to purchase a property in Calumet City, Illinois. Tr. at 181-82. According to the report, Williams owned a Land Rover on which she owed $22,000. Tr. at 182. In fact, the Land Rover was Giddens' vehicle. He told Materna that he kept it in Williams' name, "probably because it's better to hide some income and assets that could be in her name." Tr. at 182, line 24 – p. 183, line 1.

Giddens sought to modify the mortgage on his Wrightwood home after it went into foreclosure proceedings sometime after the divorce. Tr. at 168-69. When asked whether his brother Mark assisted him with the modification, Giddens testified:

> My brother did not fill out that [homeowner information modification packet]. I had somebody else. I hired somebody to do a modification for my – for my home. My brother never even – he wasn't even involved with that.

Tr. at 137, lines 1-4.

A few minutes later, Giddens acknowledged that his brother Mark had a business named Mark Anthony & Associates, and that a letter to Chase Bank on the letterhead of Mark Anthony & Associates requested a modification of his mortgage. Tr. at 141; Bates 000498. A second letter authorized Mark Anthony & Associates to speak with Chase Bank regarding Giddens' mortgage. Bates 000499. Giddens eventually testified that a vice president at his brother's company did the modification. Tr. at 151.

On October 20, 2010, Giddens filled out an Application and Affidavit to Sue or Defend as an Indigent Person in the Circuit Court of Cook County. Tr. at 147; Bates 000512-513. Under penalty of perjury, he stated on the Application that his address was 2738 West Adams.

9

In fact, that is his grandparents' address. Tr. at 147-48. Giddens also stated on the Application that he owned no real estate, even though he owned 6208 West Wrightwood. When pressed for more details at trial, Giddens complained:

> I don't – you ask me to remember stuff. I just remember this form. I don't remember when did I fill out and all this stuff. Remember, I was going blind at the time, so come on, I don't know what this is right here.

Tr. at 149, lines 5-9. To explain all of his behavior, Giddens testified that "the reason why I did all of this, I couldn't see at all. I have optic neuritis." Tr. at 153, lines 22-24. No further evidence of Giddens' medical condition was submitted at trial.

By the spring of 2012, Giddens had numerous medical bills as well as the financial obligation to Morales, and he wanted a fresh start for his newborn son. Tr. at 203. When Giddens was asked on cross-examination to elaborate on his responsibilities toward his son, however, the following exchange occurred:

> Q. And you know that a petition for contribution to towards your son's expenses has been filed in the Skokie courthouse, correct?
>
> A. This is not pertaining to what is going on. My personal matter I don't want to speak about.
>
> Q. I know you don't. But you know that your next court date is June 6th, right?
>
> A. No, I don't know, and I would like not to speak about it.
>
> Q. And you haven't paid any support towards your son, have you?
>
> THE WITNESS: Your Honor, I have been taking care of my kid. Why is this concerning --
>
> THE COURT: I'm sorry, he opened the door. So he can ask the question.
>
> BY THE WITNESS:
>
> A. Well, I plead the Fifth. I'm not going to answer your question. I'm not going to answer questions about my son.
>
> BY MR. BURCH:

10

Q.   And you understand you pleading the Fifth indicates that --

THE COURT:   All -- all -- all inferences may be drawn against you in the civil case.

THE WITNESS:   Okay. I don't plead then. Ask my question --

Tr. at 204, line 11 – p. 205, line 11.

Giddens filed for relief under Chapter 7 of the Bankruptcy Code on April 17, 2012. Morales filed this complaint shortly thereafter.

## CONCLUSIONS OF LAW

Creditors seeking a determination that their debt is nondischargeable pursuant to 11 U.S.C. § 523 bear the burden of proof. First Weber Group, Inc. v. Horsfall, 738 F. 3rd 767, 774 (7th Cir. 2013). They must prove each element of their § 523 claim by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287-88 (1991). Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. Matter of Scarlata, 979 F. 2nd 521, 524 (7th Cir. 1992).

Giddens' Debt to Morales is Not Excepted From Discharge as the Result of a Willful and Malicious Injury.

The court will first consider whether Giddens' debt to Morales is nondischargeable pursuant to 11 U.S.C. § 523(a)(6):

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— . . . .

(6)   for willful and malicious injury by the debtor to another entity or to the property of another entity; . . . .

In order to sustain a claim under 11 U.S.C. § 523(a)(6), Morales must prove by a preponderance of the evidence that Giddens: (1) caused an injury; (2) acted willfully; and (3) acted maliciously. See In re Cole, 378 B.R. 215, 226 (Bankr. N.D. Ill. 2007). "[O]nly acts done

11

with the actual intent to cause injury" come within the scope of § 523(a)(6). Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998).

There is a split of authority regarding when a debt arising from an intentional breach of contract – such as a failure to make payments due under a judgment for dissolution of marriage – may be excepted from discharge. The Ninth Circuit requires the breach to be accompanied by tortious conduct, which should not be conflated with intent to injure. Lockerby v. Sierra, 535 F. 3rd 1038, 1042 (9th Cir. 2008). In the Fifth Circuit, however, any breach of contract is nondischargeable if there was intent to injure or injury was substantially certain to result. In re Williams, 337 F. 3rd 504 (5th Cir. 2003). In Wish Acquisition, LLC v. Salvino, 2008 WL 182241, *3–4 (N.D. Ill. Jan. 18, 2008), Judge James Zagel of the Northern District of Illinois noted the split between Circuits and concluded that the better line of cases requires tortious conduct.

This court concurs with Judge Zagel's conclusion that tortious conduct is required for a breach of contract to result in a nondischargeable debt, especially as the opposite line of cases may discourage efficient breaches of contract. See, e.g., XCO Intern., Inc. v. Pacific Scientific Co., 369 F. 3rd 998, 1001 (7th Cir.2004) ("It is true that if there is a very stiff penalty for breach, parties will be discouraged from committing 'efficient' breaches, that is, breaches that confer a greater benefit on the contract breaker than on the victim of the breach, in which event breach plus compensation for the victim produces a net gain with no losers and should be encouraged.").

Morales alleges that the tortious conduct in this case is conversion.

> To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property.

Loman v. Freeman, 229 Ill. 2nd 104, 127 (Ill. 2008) (citation omitted). Therefore, to obtain a finding that Giddens' debt to her is nondischargeable, Morales must prove the elements of conversion as well as the elements of § 523(a)(6) by a preponderance of the evidence.

The Jeep and furniture were eventually delivered to Morales,[1] so the property to which Morales had a right and that she alleges has been converted is the $227,000 that she was awarded in the JDOM. She had an absolute and unconditional right to the possession of that amount as of July 1, 2008. The evidence shows that she repeatedly demanded the money.

However, "[t]he subject of conversion is required to be an identifiable object of property of which the plaintiff was wrongfully deprived." In re Thebus, 108 Ill. 2nd 255, 260 (Ill. 1985). "An asserted right to money normally will not support a claim for conversion. Only if the money at issue can be described as 'specific chattel,' – in other words, 'a specific fund or specific money in coin or bills,' – will conversion lie." Horbach v. Kaczmarek, 288 F. 3rd 969, 978 (7th Cir. 2002) (citations omitted). It is not necessary that the money be specifically earmarked, "but it must be capable of being described as a specific chattel." Thebus, 108 Ill. 2nd at 260. A creditor who is "simply owed a debt" cannot be the victim of conversion. LFG, LLC v. Navarre, 2002 WL 1379112, *3 (N.D. Ill. 2002).

Morales is owed a debt by Giddens by virtue of the agreement memorialized in the JDOM. The funds owed to her cannot be described as "a specific fund or specific money in coin

---

[1] Compare In re Neumann, 182 B.R. 502 (Bankr. N.D. Ohio 1995). Court found conversion where plaintiff had been deprived for more than two years of the personal property to which she was entitled under a divorce decree, and none of the property had been turned over. Debtor-defendant admitted "to having junked and sold some of the property, as well as the admission that he is still in possession of the remaining items that were to be distributed pursuant to the Divorce Decree." 182 B.R. at 506.

or bills." It is possible for an award under a JDOM to be the subject of conversion,[2] but not in this case.

Therefore, Morales cannot satisfy the requirements of a cause of action for conversion, and her claim under § 523(a)(6) must fail.

<u>Giddens' Debt to Morales is Nondischargeable Pursuant to 11 U.S.C. § 523(a)(2)</u>

Although Giddens' debt to Morales is not excepted from discharge pursuant to § 523(a)(6), another subsection of § 523(a) may apply. The court will consider the question of dischargeability under § 523(a)(2):

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (2)   for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . .

Actual fraud has been broadly described by the Seventh Circuit:

> Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

<u>McClellan v. Cantrell</u>, 217 F. 3rd 890, 893 (7th Cir. 2000) (quotation omitted).

Morales alleged that Giddens' debt to her was the result of fraud because he incurred the JDOM obligation without any intention of paying her, and because he repeatedly delayed and forestalled her collection efforts so that a debt due on July 1, 2008, remained unpaid when he filed for relief under the Bankruptcy Code nearly four years later.

---

[2] See In re Straub, 192 B.R. 522, 526 (Bankr. D.N.D. 1996) ("This court has recognized a cause of action for conversion in a divorce context where the divorce court expressly awarded the non-debtor spouse specific property."); In re Thomas, 47 B.R. 27, 33-34 (Bankr. S.D. Cal. 1984).

Although promises regarding a future fact are not generally actionable under § 523(a)(2)(A), see In re Alomari, 486 B.R. 904, 911-12 (Bankr. N.D. Ill. 2013), they will support a cause of action if the promise was made "with the intent not to keep it." Perlman v. Zell, 185 F. 3rd 850, 852 (7th Cir. 1999). While a defendant's part performance or attempts to perform generally suggest a lack of fraudulent intent, see In re Donlevy, 342 B.R. 774, 780 (Bankr. N.D. Ill. 2006), that is not the inference appropriate here, where Giddens' partial performance was the result of Morales' multiple visits to court to compel that performance.

Many courts have concluded that "courts can consider subsequent conduct as long as that conduct provides an indication of the debtor's state of mind" at the time he made promises to the creditor. See In re Hanson, 437 B.R. 322, 327-38 (Bankr. N.D. Ill. 2010) (collecting cases). "Determining whether a debtor had the requisite intent under § 523(a)(2)(A) is, therefore, a factual, subjective inquiry decided by examining all of the relevant circumstances, including those that took place after the debt was incurred." Id. at 328 (citations omitted). "After all of the evidence has been produced, the court must then determine whether the circumstances, viewed in the aggregate, present 'a picture of deceptive conduct' by the debtor, indicating an intent to defraud the creditor." Id. (citations omitted).

There is no question but that all of the circumstances of this long-running dispute present "a picture of deceptive conduct" by Giddens toward Morales, indicating an intent to defraud at the time he made his promise to pay her, and that he would do whatever it took to avoid satisfying that obligation.

Despite the agreed terms of their Judgment for Dissolution of Marriage, it took years for Morales to recover anything Giddens owed her. During every step of the collection proceedings, Giddens refused to comply with state court orders until charged with contempt or incarcerated.

15

See In re Hallagan, 241 B.R. 544, 547-48 (Bankr. N.D. Ohio 1999) (debtor's knowing failure to comply with obligations in an agreed state court judgment for dissolution of marriage, inter alia, was fraudulent conduct upon his ex-spouse). The Hallagan court also found that the debtor "knowingly chose to pay other obligations while under court order to pay payments to Sullivan [his ex-spouse] which he deliberately failed to make. The circumstances between the parties surrounding the execution of the agreed order makes it apparent that the Debtor harbored an intent not to pay Sullivan which existed at the time he executed the agreed order." Id. at 548.

When a state court judge ordered Giddens to put his Bentley up for sale through consignment, his best friend Michael Jocic suddenly filed a lawsuit seeking possession of the car. Despite the evidence that Giddens' brother Frederick furnished the down payment, Jocic alleged that he had given the money to Giddens in appreciation for clerical services. Such were the lengths that Giddens would go to in order to avoid paying Morales. Since Jocic's complaint was handwritten and the lawsuit was filed pro se, it appears that no lawyer would help Giddens and Jocic with what the court can only conclude was a delay tactic. Indeed, the lawsuit was eventually dismissed for want of prosecution.

When Giddens finally turned over the Jeep awarded to Morales, it had been trashed. As to the personal property, Giddens first tried to pass off thrift store furniture as the furniture from the family home. Giddens told Morales twice – once after turning over the Jeep and again after finally turning over the correct furniture – that she would get nothing else from him, even though he owed her tens of thousands of dollars.

The evidence showed that prior to entry of the JDOM Giddens was already starting to hide property from Morales. In May 2006, Giddens or his personal banker Elizabeth Ramos made several withdrawals or cashed certificates of deposit totaling $348,338.85. That same

month, his brother Frederick deposited exactly that amount in an account at Fifth Third Bank. Although Giddens testified that the money was payment for two stores, no other evidence was introduced in support of this explanation. Based on the transfers, the deposit, and Giddens' flimsy cover story, the court infers that Giddens was already hiding money from Morales.

In further support of this inference, the court notes Materna's testimony that Giddens told her he kept property in his family members' names so he could hide it from his ex-wife. He hid real estate in his brothers' names and a car in his aunt's name. For example, 628 North Christiana was transferred to Mark Giddens just a month before the contract with Materna was signed, and what was the address to which the recorded deed should be sent? Christopher Giddens' house on Wrightwood.

Giddens' counsel argued at closing that Materna's testimony should be given no weight because she was both a spurned lover and a creditor. For several reasons, the court declines this invitation and in fact finds Materna's testimony very credible. First, her demeanor on the witness stand was forthright and unembellished. Second, she has no dog in this fight. Marta Morales seeks a finding that her debt and her debt alone is nondischargeable. If Materna is owed money, any claim she has will be unaffected by this lawsuit even if Morales prevails. Supporting Morales' claim for nondischargeability actually makes it less likely that Materna will ever see any money from Giddens.

Finally, regarding the question of credibility, the court has never seen a witness as unbelievable as Christopher Giddens. It is impossible to count the number of times he did not know or could not remember a fact. Even more remarkable was the recovery of his memory when the answer to a question might help his case, as with the handwritten contract between himself and Materna that he insisted was three pages rather than one.

Giddens seemed incapable of telling the truth. Several times he refused even to confirm that the signature on certain documents was his own.

Q: Directing your attention to the lower right-hand portion of the document, there's a date, correct?

A: 2006.

Q: And it also has your signature on it, correct?

A: It has a signature on it.

Q: And that's your signature, correct?

A: It has a signature on there.

Q: Do you know whether or not that's your signature?

A: I don't know. I don't know the authenticity of this document.

Tr. at 64, line 17 – p. 65, line 4, discussing Bates 000343.

Giddens remembered absolutely nothing about documents that would not help his case. "I don't remember. If you want to ask a question, you've got to show me something." Tr. at 70, lines 15-16. Yet when he was asked about the handwritten contract between himself and Materna, his memory was remarkably clear. That handwritten contract was dated June 7, 2011, but when he was pressed for details regarding the Application and Affidavit to Sue or Defend as an Indigent Person, which he signed just eight months earlier and in which he stated under oath that he owned no real estate, Giddens complained that "I don't – you ask me to remember stuff. I just remember this form. I don't remember when did I fill out and all this stuff."

At the time Morales and Giddens separated, she had been living a very comfortable lifestyle. During the marriage she lived in the marital home (in which Giddens still resides), a four bedroom single family house. She and Giddens each started their own business. The home was well-furnished.

Now, Morales lives with her brother. She works as a night cook at a casino and earns $13.60 per hour. She had hoped to go back to school after the divorce, but knows that is currently impossible. Neither can she live on her own. Instead, she is dependent on her brother's charity. Meanwhile, Giddens kept the home and most of the furnishings and other real estate. His lifestyle appears unchanged. Although he listed only the Wrightwood home on Schedule A, he admitted to Materna that he transferred property to family members in order to keep Morales from finding it.

Considering all of the circumstances of this case, the court finds that Morales has demonstrated by a preponderance of the evidence that Giddens intended to defraud her. There is no question that these facts, viewed in the aggregate, present 'a picture of deceptive conduct' by Giddens. The Seventh Circuit tells us that fraud "includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." McClellan, 217 F. 3rd at 893. Having reviewed the evidence, listened to the testimony and observed the demeanor of these witnesses, there can be no other conclusion but that Giddens cheated Morales. She hoped to avoid a trial and have a fresh start with a reasonable settlement; instead, she spent the next six years chasing her ex-husband for money he never intended to pay her in the first place.

The court finds that Giddens' debt to Morales was the result of fraud. He incurred the JDOM obligation without any intention of paying her. It is therefore excepted from discharge.

## CONCLUSION

For the reasons stated above, the court will enter judgment for Christopher Giddens on Count I of the complaint, which seeks a finding of nondischargeability pursuant to 11 U.S.C. §§ 523(a)(5) and (a)(15). The court will also enter partial judgment for Giddens on Count II, to the extent it requests relief under § 523(a)(6). The court will enter partial judgment for Morales on Count II to the extent it requests relief under § 523(a)(2). Giddens' debt to Morales is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2).

Date: 5 AUG 2014

PAMELA S. HOLLIS
United States Bankruptcy Judge